Jack E. HART, et al.,
Plaintiffs-Appellants,

v.

**PULTE HOMES OF MICHIGAN CORPORATION, et al.,**
Defendants-Appellees.

No. 83–1156.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 15, 1984.

Decided June 6, 1984.

Donald F. Tucker, Robert J. Williams, Jr., argued, Simon, Deitch, Siefman, Tucker & Friedman, Southfield, Mich., for plaintiffs-appellants.

Stephen Wasinger, argued, Charles S. Rudy, Barris, Sott, Denn & Driker, Detroit, Mich., for defendants-appellees.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

The plaintiffs appeal from an order dismissing their complaint alleging violations of federal securities laws. The district court held that the defendants' sale and lease-back of model homes did not constitute securities for purposes of the federal securities laws. Because we find that the plaintiffs failed to show investment in a common enterprise, a necessary element of a security, we affirm.

## I.

The plaintiffs, a group of individuals and one co-partnership, separately purchased 23 model homes from Pulte Homes of Michigan Corp. ('Pulte Homes'). Pulte Homes, a large real estate developer and residential builder, marketed the model homes during 1980 in subdivisions in the metropolitan Detroit area. The houses were offered on the condition that they be leased back to Pulte Homes for use as model homes. The plaintiffs purchased the homes not as personal residences, but on the expectation that the properties would increase in value. When the plaintiffs failed to realize the return they were allegedly led to expect, this action ensued.

The plaintiffs brought suit against Pulte Homes, its parent company, Pulte Homes Corp., and the National Bank of Detroit, an institution that offered financing for the purchases.[1] In their complaint, plaintiffs claim that they were fraudulently induced to purchase the homes on Pulte Homes' representations that it would develop the surrounding areas and cause the model homes to appreciate in value. The plaintiffs further maintain that the sale and lease-back arrangements were securities under the Securities Act of 1933 and the Securities and Exchange Act of 1934. Failure to register these alleged securities, they claim, violated section 5 of the 1933 Act, 15 U.S.C. § 77e. The plaintiffs also maintain that Pulte Homes' misrepresentations violated section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and section 10(b) and Rule 10(b)(5) of the 1934 Act, 15 U.S.C. § 78(j), 17 C.F.R. § 240.10b–5. In addition to the claim of common-law fraud under state law, the plaintiffs allege violations of Michigan securities laws and breach of contract.

The plaintiffs attached to their complaint several exhibits including a promotional brochure from the Trerice Company, a marketing and investment firm representing Pulte Homes. The brochure described the properties as completely furnished houses offered for sale on a "sale-leaseback basis" because Pulte Homes "will require their

---

1. While this appeal was pending, the plaintiffs dismissed their claims against the National Bank of Detroit.

continued use as model homes in the respective subdivisions which they are marketing." The houses, according to the brochure, offered "the potential for excellent appreciation in value during the holding period." The leases, which would run for terms of 18 months, two and three years, would return a rent equal to the annual debt service on a mortgage of 80 percent of the sale price. A lease was subject to cancellation by Pulte Homes if it found a buyer who would purchase the house at market price. The brochure also asserted that Pulte Homes would provide for insurance, maintenance, utilities and real estate taxes. Buyers were responsible for locating financing for the transactions, but the brochure stated that Pulte Homes had arranged for the National Bank of Detroit to offer loans to qualified buyers. The brochure also included a map showing the locations of 21 subdivisions scattered around Detroit where the model homes were located.

The plaintiffs attached to their complaint a copy of a lease that contained the provisions described in the brochure. Another exhibit was a letter from the Trerice Company to one of the plaintiffs describing the purchase of a model home as a "no-management, high leverage, low downpayment, real estate investment featuring excellent tax shelter possibilities and superb appreciation potential." The plaintiffs also attached a list indicating the purchases by the plaintiffs of 23 model homes in 8 subdivisions.

In ruling on the defendants' motion to dismiss the complaint under Rule 12(b)(6), Fed.R.Civ.P., the district court examined the complaint and attached exhibits. The court held that because the sale and lease-back arrangements were not "investment contracts," the plaintiffs had failed to state a claim under the federal securities laws. Because the alleged violations of these laws formed the basis of federal jurisdiction, the district court dismissed, without prejudice, the remaining state claims under the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The district court began its analysis with *SEC v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), a primary source on what constitutes an investment contract for purposes of the federal securities laws. In *Howey*, the Supreme Court defined an investment contract as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Id.* at 298–99, 66 S.Ct. at 1102–03. In this case the parties agree that there was an investment of money. The district court, therefore, focused on whether the plaintiffs had invested in a common enterprise with an expectation of profits from the efforts of others.

Relying on *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir.1981), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981), the district court held that commonality requires a pooling of funds among investors, i.e., "horizontal" as distinguished from "vertical" commonality. The district court found nothing in the pleadings supporting the plaintiffs' claim that such a common enterprise existed. The court found that the "defendants nowhere promised to plaintiffs that defendants would develop these subdivisions successfully." The district court noted, however, that the requirement of commonality may be satisfied if some of the investors "did pool their funds to buy individual homes."

Regarding the final element of the *Howey* test, the district court found that the lease-back arrangement did not give rise to an expectation of profits solely—or primarily—from the efforts of Pulte Homes. The court found that the defendants were under no contractual duty to develop the subdivisions and that the plaintiffs had no right to share in the profits of successful development. The court again stressed that "[n]othing in the agreements—or, in fact, in plaintiffs' allegations—indicates otherwise." The court found that the

plaintiffs' hopes for appreciation based on their expectation of development was "not enough to make these transactions securities."

On appeal, the plaintiffs contend that the district court erred in dismissing their federal claims. The plaintiffs maintain that the complaint and the attached exhibits support their claim that the transactions were investment contracts. Alternatively, the plaintiffs contend that the district court's decision rests on improper findings of disputed factual issues. In particular, the plaintiffs argue that the district court's determination that Pulte Homes was under no contractual obligation to develop the subdivisions is contrary to the allegations in the complaint.

## II.

■ Our analysis of the plaintiffs' complaint and exhibits is guided by the Supreme Court's admonition that the substance of the transactions—"the economic realities"—should determine whether the lease-back arrangements were securities. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975). *See also American Bank & Trust Co. v. Wallace*, 702 F.2d 93 (6th Cir.1983). Viewed in this light, the plaintiffs' allegations fail to show "investment in a common venture." *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060.

■ This circuit has interpreted the *Howey* test as requiring a showing of horizontal commonality.

> Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. [citation omitted] In fact, a finding of horizontal commonality requires a sharing or pooling of funds.

*Union Planters National Bank*, 651 F.2d at 1183.

The seminal decision of *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), illustrates the degree of commonality required when investors expect profits in the form of property appreciation brought about through the entrepreneurial efforts of a developer. In *Joiner*, the defendant offered investors leasehold interests with the promise to drill an oil well "so located as to test the oil-producing possibilities of the offered leaseholds." The Court held that the transactions were securities. The Court found that the investors were all linked together in the common venture to drill a test well. "[T]he undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348, 64 S.Ct. at 122. Without the drilling enterprise, "no one's leases had any value." *Id.* at 349, 64 S.Ct. at 122.

In the instant case, the plaintiffs have alleged no set of facts showing that the fate of each purchaser's investment was tied to that of the other investors through a common scheme. Nothing in the complaint or exhibits suggests the existence of a common development arrangement as in *Joiner*. Even assuming that individual purchasers were assured of development, nothing in the pleadings suggests that the fortunes of individual purchasers were "inextricably intertwined" by contractual or financial arrangements. *Union Planters*, 651 F.2d at 1183.

The mere fact that an assurance of development to each investor may have come from the same seller does not satisfy the requirement of horizontal commonality. In *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972), *quoted in Curran v. Merrill Lynch, Pierce, Fenner & Smith*, 622 F.2d 216 (6th Cir.1980), *aff'd on other grounds*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), the Seventh Circuit held that a discretionary trading account in commodity futures is not a security, even though the broker had other such accounts with other customers, because of the absence of a common enterprise. Mr. Justice Stevens (then Judge Stevens) wrote: "[The broker's] various customers were represented by a common agent, but they were not joint participants in the same investment enterprise."

*Milnarik,* 457 F.2d at 276–77. In this case, the plaintiffs purchased from a common developer, but they have not shown that they are participants in a common development enterprise.

The plaintiffs urge this court to follow the Tenth Circuit's decision in *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036 (10th Cir.1980). There, the appeals court reversed a dismissal of a complaint charging that the defendant's sales of lots in one planned subdivision constituted investment contracts. The court found the dismissal improper because the plaintiffs "reasonably alleged the existence of investment interest and common enterprise ... and nothing in the complaint precludes the finding of a security." *Id.* at 1040. The fate of each investor's investment, therefore, was necessarily tied to the development of that one subdivision. In this case, the pleadings do not show a common venture combining investment funds and risks. The picture that emerges from a liberal reading of the complaint and exhibits is an offer of sale and lease-back of model homes in 21 subdivisions and a series of 23 transactions in 8 separate subdivisions. Nothing in the complaint intimates a pooling of risks and investments among these purchasers.

If the holding in *Aldrich* suggests that assurances of development to individual purchasers satisfy the requirement of commonality, we must disagree. In *Joiner,* the Supreme Court stressed that the sale of leases was the essential financing mechanism for the common drilling enterprise. In this case, the plaintiffs have alleged no set of facts showing such a close relationship between the sale of model homes and the financing of common development. Even where Pulte Homes sold more than one model home in a single subdivision, there is no showing of an arrangement to pool investments for common development. Such an arrangement, the Supreme Court

emphasized in *Joiner,* must be interwoven into the transactions.[2]

Where the alleged security involves the transfer of interest in appreciable property, plaintiffs must clearly show that the transfer is integral to the common development scheme. The Ninth Circuit, in a case prior to *Aldrich,* held that promotional representations of intended development were insufficient to establish the necessary degree of commonality where the plaintiffs purchased land in an area under a common development plan. In *De Luz Ranchos Investment, Ltd. v. Coldwell Banker & Co.,* 608 F.2d 1297 (9th Cir.1979), the appeals court affirmed summary judgment for the defendant land developer, holding that the promotional representations, which were absent from the documents transferring ownership of the properties, were "not essential to the existence of a valuable consideration for the purchase." *Id.* at 1301. Because the purchases bore such a "tenuous relationship" with the alleged common development venture, there was no investment contract within the meaning of the federal securities laws. *Id. See also Woodward v. Terracor,* 574 F.2d 1023 (10th Cir.1978).

We conclude, therefore, that plaintiffs here, in purchasing these model homes, were not investing in a "common enterprise" because their investment of funds and the risk they undertook were not linked each with the other. This is true because the offerings of these model homes were scattered in 21 different subdivisions and 23 purchases were made in 8 separate subdivisions. Furthermore, there was not, as in *Joiner,* a claim that the sales were necessary to finance the development of these subdivisions. Accordingly, the judgment of the district court is AFFIRMED.

---

2. We disagree with the district court's suggestion that horizontal commonality may be met by a showing that investors combined their funds voluntarily to purchase some of the model homes. Commonality must be essential to the venture offered by the developer.