867 F.2d 278
 Blue Sky L. Rep. P 72,952, Fed. Sec. L. Rep. P 94,182
R. Alan DECKEBACH; Connie M. Deckebach, Plaintiffs-Appellants,
v.
LA VIDA CHARTERS, INC. OF FLORIDA; La Vida Management Co.,
Inc.; Robert M. Dixon; Julia Dixon; George R. Bell; J.C.
Hartney; B & H Yacht Ventures; La Vida Charters, Inc. of
Virgin Islands; Caribbean Ventures, Inc.; Pamela K. Bell;
Dorothy P. Hartney; A.V. Slack, Defendants-Appellees.
 No. 87-3836.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 20, 1988.
Decided Feb. 1, 1989.
 
 Flach Douglas, Milford, Ohio, George F. Carr, Jr., Michael L. Cioffi argued, Cincinnati, Ohio, for plaintiffs-appellants.
 Michael L. Gay, Cincinnati, Ohio, Elizabeth A. Horwitz argued, for defendants-appellees.
 Before KEITH and WELLFORD, Circuit Judges, and HORTON*, Chief District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 R. Alan and Connie M. Deckebach, plaintiff/appellants, seek reversal of the district court's grant of partial summary judgment in favor of the defendant/appellees, La Vida Charters, Inc. and La Vida Management, Inc. (sometimes referred to collectively as "La Vida"); Robert M. Dixon, Julia Dixon and A.V. Slack, shareholders and directors of the two La Vida corporations; Caribbean Ventures, Inc., a successor corporation of La Vida Charters, Inc.; B & H Yacht Ventures, a partnership, and its four partners, George Bell, Pamela Bell, J.C. Hartney and Dorothy Hartney. The two La Vida corporations, the Dixons and George Bell are the primary focus of the Deckebachs' state and federal securities law and RICO claim arising out of the purchase of a yacht from La Vida Charters, Inc. to be operated and managed by La Vida Management, Inc.
 
 
 2
 The district court dismissed plaintiffs' claims of violations of state and federal securities laws and their RICO claim predicated on violations of federal securities laws, because it concluded that plaintiffs' yacht and management agreement purchase did not constitute a "security" for purposes of either state or federal securities laws.[1] The district court concluded that the Deckebachs failed to demonstrate the element of horizontal commonality, a prerequisite to constitute a "security" under the Sixth Circuit's interpretation of federal law, and that the "investment" plaintiffs made failed also to comport with the requirements of a security under Ohio law. The Deckebachs appeal the grant of partial summary judgment against them.[2] We affirm.
 
 
 3
 The facts, virtually undisputed, indicate the following scenario. The Deckebachs initiated negotiations with Bell in 1982 to purchase a Pearson 36 Cutter yacht owned by B & H Yacht Ventures. The yacht was at that time harbored in St. Thomas, Virgin Islands, under a management program with La Vida. The Deckebachs had been supplied Bell's name by the Dixons, from whom the Deckebachs had previously chartered yachts. Dixon had provided the Deckebachs with La Vida promotional materials, including a document entitled "Should You Cruise Your Investment," describing yacht management as a combination of the sale of a yacht and then the placement of the yacht in charter service. Those materials explained that La Vida would exercise significant day to day managerial control on behalf of the yacht "owner."
 
 
 4
 Bell also furnished the Deckebachs with a variety of information, including financial projections and statements of actual income and expenses from his own yacht ownership experience with B & H Yacht Ventures. After consulting with their own tax advisor and legal counsel, plaintiffs decided to purchase the yacht offered. It is clear that they planned to utilize the management program designed and offered by La Vida to acquire the yacht by using rental income to finance its purchase. Ultimately, the goal was to use the yacht solely for personal purposes. The Deckebachs, however, could not deny that neither La Vida nor Bell could make any guaranty as to the amount of income the charter of their yacht to third parties would generate. The Deckebachs also understood that they were not required to have their yacht managed by La Vida, or by any management company. (It was not, in sum, a "tie-in" arrangement.)
 
 
 5
 As part of the arrangement, the parties agreed that Bell would trade-in the yacht in question to La Vida Charters, Inc. as a downpayment on the purchase of a new yacht and then that La Vida entity would sell the yacht to the Deckebachs. The sale was structured in this way to obtain favorable tax treatment for B & H Yacht Ventures. On September 6, 1983, the Deckebachs entered into an agreement with La Vida to purchase the yacht for $120,500, contingent upon the Deckebachs entering into a management contract with La Vida. The agreement, drafted by the Deckebachs' counsel, also provided that the management contract would extend for five years, but this provision was eliminated at La Vida's insistence. Instead, the management agreement, which was actually executed on October 3, 1983, was terminable by either side upon 60 days written notice by either party. La Vida Management would harbor and maintain the yacht and arrange for its charter to third parties under the agreement. La Vida would receive a monthly management fee and a commission on each charter arranged for the yacht.
 
 
 6
 La Vida managed a number of other vessels for owners other than plaintiffs, classifying the vessels by type and size. La Vida gave priority to vessels in each class which had been available for charter the longest period of time. Personal use of the vessels was not restricted except in the case involving a pre-existing charter contract. The management agreement also provided that La Vida was an independent contractor, not a partner, joint venturer or employee of the Deckebachs, and La Vida made no claim to ownership, title, or property interest in the vessel. The Deckebachs did not claim that they were involved in a joint venture with La Vida or any of the other defendants. It was clear that other boat owners using La Vida did not have an ownership interest in the Deckebach yacht, and the contrary applied as well.
 
 
 7
 The Deckebachs never placed money in a common fund with other owners and the income generated by charters of each yacht was segregated and applied towards its expense of maintenance and operation. Although some expense was directly attributable to the Deckebachs' yacht, expenses generally were allocated pro rata among the boats in a particular class or among all the boats in the fleet. There was no sharing or pooling of funds by the various yacht owners dealing with La Vida under the management arrangement.
 
 
 8
 In March, 1984, Dixon advised the Deckebachs that another boat had erroneously been assigned a charter which should have been assigned to their boat in accordance with the standard rotation policy. Dixon assured plaintiffs that the mistake would be rectified by giving them a charter "out of turn." In October, 1984, Bell, who by then had become associated with La Vida, wrote the Deckebachs and explained to them that because other boats in the same class as the Deckebachs' yacht had been removed from the fleet; it had, in effect, been moved ahead in the rotation. He claimed no other feasible way to compensate for the mistaken lost charter because one could not "go back and remove charter income from one of the 36's that have left our fleet at this date."
 
 
 9
 The Deckebachs' yacht never operated at a profit. They ceased making required payments to La Vida Management in early 1986 and La Vida terminated the management agreement. The yacht is now listed for sale. The Deckebachs contend that they have unsuccessfully attempted to place the yacht with other charter management companies.I. Federal Securities Law Claims
 
 
 10
 The Securities Act of 1933, 15 U.S.C. Sec. 77b(1) defines a "security" as:
 
 
 11
 [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferrable share, investment contract, voting-trust certificate, certificate of deposit for security, fractional undivided interest in oil, gas or other mineral rights, or in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or to purchase any of the foregoing.
 
 
 12
 The term "security" is similarly defined in the Securities Exchange Act of 1934. See 15 U.S.C. Sec. 78c(a)(10). The Deckebachs claim violations of both Acts. The definition of "security" set forth in both Acts has been found to be "virtually identical." Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).
 
 
 13
 The Deckebachs contend that the purchase/management arrangement meets the three part test set forth in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), for determining whether a particular arrangement is an investment contract for purposes of the federal securities laws. Howey requires: (1) an investment of money; (2) in a common enterprise; (3) an expectation of profits that will be derived solely from the efforts of others. 328 U.S. at 298-99, 66 S.Ct. at 1102-03. In Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216, 222 (6th Cir.1980), we construed the "common enterprise" element of the Howey test to require a demonstration of "horizontal commonality."
 
 
 14
 Plaintiffs ask us to reconsider prior law requiring a showing of horizontal commonality in order to support a finding that an investment constitutes a security. Plaintiffs point to the approach of other circuits which have interpreted Howey to require only a demonstration of vertical commonality. They contend that such a change would protect innocent consumers or investors such as themselves, whose capital may effectively be used to finance a charter business by defendants without adhering to the disclosure and registration requirements of the securities laws. They assert defendants structured the agreement at issue as a yacht purchase rather than as a straightforward investment of funds in a charter business simply as a matter of form in order to avoid application of securities laws.
 
 
 15
 In Curran, we brought our rationale in these cases in line with Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). We specifically rejected the vertical commonality approach adopted by the Second, Fifth, and Ninth Circuits. Curran, 622 F.2d at 222-23. See SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.1974); SEC v. Glen W. Turner Enter., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); Glen-Arden Commodities, Inc. v. Constantino, 493 F.2d 1027 (2d Cir.1974).[3]
 
 
 16
 Curran gave a reasoned analysis of the distinction between horizontal and vertical commonality and offered a cogent explanation of its decision to adopt the Milnarik rationale. We reasoned that the more liberal vertical commonality approach to the finding of a "security" under federal law effectively excises the common enterprise requirement from Howey. Without some link between multiple investors, the finding that, for example, the relationship between a stockbroker and the customer for whom the broker manages a discretionary trading account constitutes a common enterprise would in truth mean the adoption of an expansive "risk capital" approach that would effectively transform the Howey into a two part, rather than a three part, test. Curran, 622 F.2d at 224 (quoting Berman v. Bache, Halsey, Stuart, Shields, Inc., 467 F.Supp. 311, 315-16 (S.D.Ohio 1979)).
 
 
 17
 We reiterated the distinction between the two approaches and this circuit's adoption of the horizontal commonality requirement in Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174, 1183 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).
 
 
 18
 A vertical relationship is best illustrated by a one-on-one arrangement between a lender and a customer. A horizontal common enterprise, on the other hand, requires a heightened degree of affiliation. Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture.... [A] requirement of horizontal commonality best comport[s] with the language of Howey, because in a common enterprise all investors must share a common fortune.
 
 
 19
 Union Planters, 651 F.2d at 1183 (citations omitted). We therefore see no justification for overruling Curran if this panel had the authority to do so.
 
 
 20
 The relevant question remains as to what constitutes horizontal commonality and whether horizontal commonality is demonstrated by the facts of this case. The district court concluded that, examining the sale and management agreement as an integrated scheme, the Deckebachs failed to demonstrate horizontal commonality between themselves and other yacht owners because "[t]here was no pooling of profits or proration of losses among the yacht owners under the management agreement with La Vida." The district court stated, as a basis for this holding:
 
 
 21
 The purchase of the yacht and the agreement for management services with La Vida at best constitutes vertical commonality since each yacht owner has an independent contract with La Vida and plaintiffs have made no showing of an interrelation with any other yacht owners. The mere fact that La Vida Management allocated charters within each class of vessels on a rotational basis does not suggest that the fortunes of the individual owners were "inextricably entwined" as required by the Sixth Circuit.
 
 
 22
 666 F.Supp. at 1051 (footnote and citations omitted). The district court relied primarily upon Union Planters Nat'l Bank and Curran, as well as Hart v. Pulte Homes of Michigan Corp., 735 F.2d 1001 (6th Cir.1984).
 
 
 23
 Hart involved a number of individuals who purchased model homes in several subdivisions and leased them back to the developer based upon assurances of activity and sales which would cause all the model homes to increase in value. Although the assurances to each individual seller may have come from the same developer, this factor alone did not satisfy the requirement of horizontal commonality because the transactions between each cash purchaser and the developer were separate from all other transactions. The critical issue in Hart, as in the present case, was whether there was a "pooling of risks and investments among these purchasers." Id. at 1005. The court, in finding no such pooling, noted the lack of any contractual or financial arrangement which linked the various purchasers and also noted that the model homes were for the most part located in different subdivisions and did not appear to be a part of a common scheme. Id.
 
 
 24
 The issue is a close one in this case because there are some factors that weigh in the Deckebachs' favor. La Vida made a uniform effort to allocate income among various yacht owners by a sequential course of chartering, but not by a pooling of funds. Second, some expenses were divided pro rata among the various yachts. Thus, the purchase/management arrangement in the present case bears some similarity to the situation present in Howey. In Howey, the defendants offered units of a citrus grove development coupled with a contract for cultivating, marketing and remitting the net proceeds to the investor. There, the Court noted:
 
 
 25
 The respondent companies are offering something more than fee simple interest in land, something different from a farm or orchard coupled with management services. They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment are therefore essential if the investors are to achieve their paramount aim of a return on their investments. Their respective shares in this enterprise are evidenced by land sales contracts and warranty deeds, which serve as a convenient method of determining the investors' allocable shares of the profits. The resulting transfer of rights in land is purely incidental.
 
 
 26
 Howey, 328 U.S. at 299-300, 66 S.Ct. at 1103 (emphasis added).
 
 
 27
 Defendants argue, on the other hand, that the financial success of the individual yacht owners was independent of the financial success of La Vida. That argument has merit in that La Vida had no ownership interest in the various yachts (as was the case with citrus groves in Howey ) and failure of the La Vida business operation would not have caused the yacht owners necessarily to fail and to lose use of their vessels. Even assuming that a purpose of the arrangement was to allow individuals to purchase yachts which they might not have otherwise been able to acquire through La Vida's offer of management to generate rental income, the success of the La Vida enterprise and its ability to attract charters had only an indirect impact upon the individuals contracting with La Vida. Although La Vida did receive a nominal monthly management fee from each yacht owner, it expected to generate operating capital through commission income as in Howey. To some extent, then, the fortunes of each yacht owner were tied to the overall success of the venture. Financing a yacht purchase by generating rental income depended, to some extent, upon the availability of yachts together under common management. The arrangement was, however, mandated only for a short period; there was no required long-term relationship.
 
 
 28
 A finding of horizontal commonality requires more than the facts of this case demonstrate. The Deckebach situation is similar to that of a customer whose discretionary trading account is handled by a broker who traded in a uniform manner for each of his customer accounts. In Milnarik the court concluded that uniform trading for separate discretionary accounts absent some pooling of funds or other evidence of a distinct contractual tie between the separate accounts or customers did not constitute horizontal commonality. In the present case, as in Curran, the Deckebachs had to know from the outset that their relationship with La Vida was essentially a one-on-one vertical relationship and constituted essentially the hiring of an independent contractor to perform services for them to produce rental income to permit ultimate payment and retention of the yacht for personal use. The Deckebachs were not required to use La Vida, and once choosing La Vida, they were not required to remain with it if dissatisfied. The Deckebachs also offered insufficient evidence to support their burden to show that the choice of another management company was not practical or economically feasible; that it was a de facto "tie-in." We find no error in the district court's conclusion that this purchase/management arrangement was not demonstrated by plaintiffs to rise to the level of a contribution or pooling of venture capital by a number of investors for a common and joint enterprise. We therefore affirm the denial of summary judgment for plaintiffs on the federal security claims.
 
 
 29
 We also find no error in the district court's decision that the essence of this arrangement was a one-on-one vertical relationship between La Vida and the Deckebachs for the management of their yacht. They admitted desiring its availability for their own personal use, essentially at their complete discretion. This distinguishes the case from the facts in Howey. Nor was this a situation where the purchase of a yacht was but a method of offering an investment in a charter business, with ownership rights in the yacht being merely incidental. We find no error in the district court's conclusion that the defendants were entitled to summary judgment on the Deckebachs' federal securities law claims, although we concede this to be a difficult and close question of law.
 
 II. State Securities Law Claim
 
 30
 Ohio law includes an "investment contract" within its definition of a security. Ohio Rev.Code Sec. 1707.01(B). An investment contract is created whenever:
 
 
 31
 (1) An offeree furnishes initial value to an offeror,
 
 
 32
 (2) A portion of the initial value is subjected to the risk of the enterprise,
 
 
 33
 (3) The furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and
 
 
 34
 (4) The offeree does not receive the right to exercise practical and actual control over managerial decisions of the enterprise.
 
 
 35
 State v. George, 50 Ohio App.2d 297, 362 N.E.2d 1223, 1227 (1975). The district court concluded that the Deckebachs failed to satisfy the "enterprise" element of the second, third, and fourth requirements of an investment contract under Ohio law, primarily for the same reasons that the Deckebachs had failed to demonstrate horizontal commonality. There is little Ohio law on what constitutes an enterprise under the investment contract test. The district court relied on an Ohio decision wherein the court refused to find a security where the plaintiffs had purchased three video games and then entered into a management contract with the promoter, giving the promoter exclusive right to operate and manage the games for three years. See Abel Investments v. Sheridan, No. 85AP-1104 (10th Dist.Ct.App.1986) (unreported). We find Abel to offer little enlightenment, however, as to whether the Ohio courts consider "enterprise," for purposes of Ohio Blue Sky laws, to be equivalent to the common enterprise Howey test.
 
 
 36
 State v. George indicates that it is difficult to tell to what extent the Ohio courts are concerned with a link between multiple investors in an enterprise. It is uncertain whether Ohio's highest court might have some tendency toward the vertical commonality approach:
 
 
 37
 The question to be answered here is whether it appears contributed sums would reasonably find their way into the general operations of the enterprise. Stated another way, it is whether such investment will become a part of the capital pool used to conduct the business being promoted by the offeror. If so, such initial value furnished by the offeree may be considered as risk capital of the enterprise.
 
 
 38
 George, 362 N.E.2d at 228 (emphasis added). In the present case, the Deckebachs' yacht was a part of the pool or stock in trade of yachts used to conduct the La Vida yacht charter business. Whether the transaction may reflect the Deckebachs' ownership of the yacht to be a part of the "risk capital" available to La Vida business operation is less certain. We cannot be sure whether or not the Ohio Supreme Court may consider only the connection between the fortunes of La Vida and the defendants on the one hand and the Deckebachs on the other as a purchaser and lessor to be necessary as a "capital pool used to conduct the business."The district court found, in any event, that the Deckebachs had failed to satisfy the fourth element of the investment test under Ohio law. Although the Deckebachs may not have chosen to exercise managerial control over their yacht, they certainly retained the right to do so under the agreement. They had authority to make decisions with regard to sums expended on the maintenance of the yacht and could at any time have chosen to forego a charter in order to use the yacht themselves. The fourth element of the investment contract test does not require an examination of whether the investor actually managed the investment, but whether it had the right to do so. Accordingly, we conclude that the district court did not commit error in holding that defendants were entitled to summary judgment on the Deckebachs' state securities law claim.[4]
 
 III. RICO claim
 
 39
 As the district court noted, the Deckebachs' RICO claim is based solely upon their claims of violation of state and federal securities laws. Failing in each of these claims, plaintiffs cannot succeed on the RICO claim. The RICO claim must also fail because the Deckebachs have failed to demonstrate that the defendants' activities fall within the definition of "racketeering activity" as set forth in 18 U.S.C. Sec. 1961.
 
 
 40
 We accordingly AFFIRM the decision of the district court.
 
 
 
 *
 The Honorable Odell Horton, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 The opinion of the district court is reported at 666 F.Supp. 1049 (S.D.Ohio 1987)
 
 
 [2]
 The parties stipulated to dismissal of the Deckebachs' remaining claim based upon fraud under Ohio common law
 
 
 [3]
 According to Curran, the vertical commonality approach may have some support in the Eighth and Tenth Circuits. 622 F.2d at 223 n. 9
 
 
 [4]
 When we are faced with an issue concerning an area of law not yet addressed by Ohio courts, we are directed to defer to the district court's conclusion if its interpretation of state law is permissible. See Home Indemnity Co. v. Shaffer, 860 F.2d 186, 188-89 (6th Cir.1988). Because the district court's interpretation of state law applicable in this case was clearly a permissible construction, we are especially hesitant to "second guess it."