888 F.2d 385
 Fed. Sec. L. Rep. P 94,767, RICO Bus.Disp.Guide 7357
 Joseph M. NEWMYER, John W. Kwiatkowski, John C. Collins and
Tobin R. Collins, (88-1345) Plaintiffs-Appellants,
v.
PHILATELIC LEASING, LTD., et al., Defendants-Appellees.
Edward O'CONNELL, (89-1288) Plaintiff-Appellant,
v.
PHILATELIC LEASING, LTD., et al., Defendants-Appellees.
 Nos. 88-1345, 89-1288.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 28, 1989.
Decided Oct. 20, 1989.
Order on Denial of Rehearing and Rehearing En Banc Nov. 27, 1989.
 
 Michael H. Whiting, Joseph A. Ahern argued, John M. Rady, Harry S. Stark, Stark, Reagan & Flinnerty, P.C., Troy, Mich., for plaintiffs-appellants.
 Robert A. Hudson, James P. Murphy, Berry, Moorman, King, Cook & Hudson, Detroit, Mich., for Philatelic Leasing, Ltd. in Hambrose Stamps, Ltd., H & J Holding Corp., Global Intern., Herman Finesod, E. Joseph McConnell, Inc., Melvin Hersch, Pimgrim Stamp & Coin, Inc., Dell Philatelic Consultants, Ltd., in Case No. 88-1345.
 Dennis K. Egan argued, Douglas G. Graham, Detroit, Mich., for Friedman & Shaftan, P.C., in Case No. 88-1345.
 Clayton P. Farrell, Noreen L. Slank, Southfield, Mich., Michael J. Barton, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., for Trager Glass & Co. in Case No. 88-1345.
 Kenneth E. Prather, James R. Stearns, Prather, Harrington & Foley, Detroit, Mich., for Boelter, Hopt & Gale in Case No. 88-1345.
 Ernest R. Bazzana, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Detroit, Mich., Elliot Silverman, Gold and Wachte, New York City, for Westminster Stamp Gallery, Ltd., in Case No. 88-1345.
 Clayton P. Farrell, Southfield, Mich., Stanley A. Prokop, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Kenneth E. Prather, Prather, Harrington & Foley, Detroit, Mich., Thomas W. Elkins, Birmingham, Mich., Donald V. Palazzo, President, Dell Philatelic Consultants, Ltd., Foxboro, Mass., for Philatelic Leasing, Ltd., in Case No. 89-1288.
 Clayton P. Farrell, Southfield, Mich., Stanley A. Prokop, Robert A. Hudson, Berry, Moorman, King, Cook & Hudson, Kenneth E. Prather, Detroit, Mich., Thomas W. Elkins, Birmingham, Mich., Elliot Silverman, Gold and Wachte, New York City, Donald V. Palazzo, President, Foxboro, Mass., for Hambrose Stamps, Ltd., M & J Holding Corp., Globe Intern., Melvin Hersch, Herman Finesod, E. Joseph McConnell, Inc., Pimgrim Stamp & Coin, Inc., Continental Management Co., D.W. Brubaker in Case No. 89-1288.
 Dennis K. Egan argued, Douglas G. Graham, for Friedman & Shaftan, P.C., in Case No. 89-1288.
 Clayton P. Farrell, Southfield, Mich., Ernest R. Bazzana, Stanley A. Prokop, Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, Robert A. Hudson, Kenneth E. Prather, Detroit, Mich., Thomas W. Elkins, Birmingham, Mich., Elliot Silverman, New York City, Donald V. Palazzo, President, Foxboro, Mass., for Robert V. Yeo, Jr., in Case No. 89-1288.
 Clayton P. Farrell, Southfield, Mich., Stanley A. Prokop, Robert A. Hudson, Kenneth E. Prather, Detroit, Mich., Thomas W. Elkins, Birmingham, Mich., Noreen L. Slank, Southfield, Mich., Elliott Silverman, New York City, Donald V. Palazzo, President, Foxboro, Mass., for Trager Glass & Co., in Case No. 89-1288.
 Clayton P. Farrell, Southfield, Mich., Stanley A. Prokop, Robert A. Hudson, Kenneth E. Prather, James R. Stearns, Prather, Harrington & Foley, Detroit, Mich., Thomas W. Elkins, Birmingham, Mich., Elliot Silverman, New York City, Donald V. Palazzo, President, Foxboro, Mass., for Boelter, Hopt & Gale, in Case No. 89-1288.
 Chester E. Kasiborski, Jr., John J. Ronayne, III, Kasiborski, Ronayne & Flaska, Detroit, Mich., for Rose, Feldman, Radin, Pavone & Skehan and Stephen R. Feldman, amicus curiae.
 Before MERRITT, Chief Judge, NELSON, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 As a speculative investment, presumably, and as a device for sheltering income from taxes, the plaintiffs in these consolidated cases executed standard-form lease and security agreements under which, in exchange for cash and promissory notes, they acquired leasehold interests in plates for printing local postage stamps bearing the names of certain small islands off the coast of Scotland. The plaintiffs had no knowledge of or experience in the stamp business, and each plaintiff elected to have the lessor, defendant Philatelic Leasing, Ltd., arrange for the printing of the stamps. In addition, most of the plaintiffs contracted with defendant Dell Philatelic Consultants, Ltd. to sell the stamps to collectors for a commission of 25 percent. The plaintiffs agreed that 50 percent of the remaining proceeds would be paid to Philatelic Leasing, in the form of prepayments on the notes, until the notes were paid in full.
 
 
 2
 The Internal Revenue Service disallowed the deductions and credits claimed by the plaintiffs on their individual tax returns. Alleging fraud and conspiracy to defraud, the plaintifs then sued the promoters of the tax shelter, with their lawyers, accountants, and others, under the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78a-78kk, the Securities Act of 1933, 15 U.S.C. Secs. 77a-77bbbb, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Secs. 1961-68.
 
 
 3
 The lawsuits were dismissed by the district court on motions filed under Rule 12(b)(1) and (6), Fed.R.Civ.P. The court held, among other things, (a) that the agreements at issue did not represent "securities," not being "investment contracts" within the meaning of the federal securities laws, and (b) that the plaintiff could not show the requisite "pattern of racketeering activity," within the meaning of RICO, because the predicate acts were all part of a single scheme.
 
 
 4
 The "single scheme" test has now been rejected by the Supreme Court, see H.J. Inc. v. Northwestern Bell Telephone Co., --- U.S. ----, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), and we shall reverse the dismissal of the plaintiffs' RICO claim for that reason. Whether the plaintiffs could show that their investments qualified as securities is a closer question, but we are not prepared to say at this juncture that the plaintiffs were not investing in "securities." We think this question presents genuine issues of material fact, and the dismissal of the claims asserted under the securities laws will therefore be reversed as well.
 
 
 5
 * The island of Staffa, an uninhabited outcropping of rock measuring about 3/4 mile long and 1/3 mile wide, is located near the Isle of Ulva in the Inner Hebrides. Johnson and Boswell visited the proprietor of Ulva and Staffa, the Chief of the Clan M'Quarrie, during their tour of the Hebrides in 1773, and the travelers were distressed to hear that although the property had been in Mr. M'Quarrie's family for 900 years, it was soon to be sold for the payment of his debts. One wonders what thoughts would have gone through the minds of the impecunious M'Quarrie and his distinguished visitors if they could somehow have foreseen the multimillion dollar financial maneuvers with which the name of Staffa was to be associated in the 20th Century.[1]
 
 
 6
 Sometime before 1979, as we learn from United States v. Philatelic Leasing, Ltd., 601 F.Supp. 1554 (S.D.N.Y.), aff'd, 794 F.2d 781 (2d Cir.1986),[2] the British government granted the Laird of Staffa and several other Scottish islands a right to issue postage stamps. The stamps would be good only for the carriage of mail between points on the islands or to the nearest British post office, where regular British postage would have to be affixed if the mail were to travel further.
 
 
 7
 The complaints in the present lawsuits, the factual allegations of which have been largely accepted as true for purposes of the motions to dismiss, state that beginning in 1979 a British corporation called Crailheath, Ltd. started acquiring stamp production rights from the islands' owners. Crailheath was owned by a certain Clive Feigenbaum. The plaintiffs' briefs assert that Mr. Feigenbaum also owned defendant Dell Philatelic Consultants, Ltd., a Massachusetts corporation with which all but one of the plaintiffs ultimately contracted to market their stamps.[3]
 
 
 8
 The consideration given by Crailheath for the stamp production rights was quite modest: $3.60 for each separate type of stamp produced, plus some free stamps. In subsequent transfers, as we shall see, the amount of money involved grew considerably larger.
 
 
 9
 Crailheath assigned its stamp production rights to defendant Global International, a Liberian corporation said to be controlled by Feigenbaum. See Philatelic Leasing, 794 F.2d at 783. Global had sets of stamp-printing plates--called "masters"--manufactured for it at a cost of approximately $1,000 per master.
 
 
 10
 On May 31, 1982, pursuant to what the plaintiffs allege was a fraudulent scheme to over-value the stamp masters, Hambrose Stamps, Ltd., a New York corporation controlled by defendant Herman Finesod, signed an option contract for the purchase from Global of up to 9,711 stamp masters, with associated copyrights, at prices ranging from $106,800 for a master that would produce two different stamps to $207,500 for a master that would produce eight different stamps. Less than two percent of these prices would be payable in cash; the balance was to take the form of promissory notes issued without recourse against Hambrose.
 
 
 11
 One day later, on June 1, 1982, Hambrose entered into an option and security agreement with defendant Philatelic, a thinly capitalized New York corporation owned by defendant Melvin Hersch. (Hersch had been hired by Finesod to act as president of Hambrose in 1980 and 1981, a period when Hambrose was making direct sales of stamp masters to the public; there was a shift from sales to leases in 1982, at which time Hersch moved from the presidency of Hambrose--where he was replaced by Finesod--to the presidency of Philatelic. See Philatelic Leasing, 794 F.2d at 784.)
 
 
 12
 Under the June 1 agreement, a two-stamp master that ostensibly cost Hambrose $106,800 could be acquired by Philatelic at a cost of $150,000. An eight-stamp master that ostensibly cost Global $207,500 would cost Philatelic $400,000. By the end of 1982, Philatelic had purchased 830 masters at prices in this range.
 
 
 13
 Philatelic had no substantial assets, and its purchases of stamp masters were made largely on credit. Philatelic gave Hambrose promissory notes with maturities and interest rates comparable to those in the notes Hambrose gave Global. The notes were issued with recourse against Philatelic, for whatever that might be worth, and they were guaranteed by Mr. Hersch personally.
 
 
 14
 Mr. Hersch had a net worth of approximately $200,000, according to the complaints; the principal amount of the Philatelic notes exceeded $160 million. The extent to which Hambrose would actually receive payment on the Philatelic notes depended almost entirely, therefore, on how much Philatelic could collect from those to whom it sold leases.
 
 
 15
 Whether Philatelic could make good on the notes given in payment for the masters would seem to have a significant bearing on whether the prices Philatelic had agreed to pay could be said to bear any relation to the masters' actual value. And the value of the masters was of critical importance to the tax advantages that Philatelic's customers hoped to achieve.
 
 
 16
 Tax savings may not have been the sole inducement for prospective investors to sign up with Philatelic--and it is significant, perhaps, that none of the plaintiffs here was in the highest tax bracket--but Philatelic and its sales force stressed the tax advantages of the investments strongly, and the tax laws in effect in 1982 unquestionably made many investors more receptive to tax shelter investments than they would have been if income taxes had been lower. Under the 1982 tax rate schedule for a single taxpayer, a person who had a taxable income of $41,500 per annum would be required to pay federal income taxes of $12,068, not counting Social Security taxes. For each dollar of income in excess of $41,500, the taxpayer would have to turn 50 cents over to the federal government. Many people in this tax bracket were eager to retain more than half of their marginal income, and sales of tax shelters flourished.
 
 
 17
 The design of the shelter offered by Philatelic may be explained by reference to plaintiff John Kwiatowski's case, which appears typical. In November of 1982 Mr. Kwiatowski entered into a lease and security agreement under which Philatelic contracted to give him a seven-year lease in a designated master and the right to print 60,000 sheets of two local stamps of the Island of Staffa. The stated rental was $30,000 per annum. Mr. Kwiatowski made a down payment of $4,500 in cash on the signing of the agreement. An additional $10,500, covered by a negotiable promissory note bearing interest at 10 percent, was to be paid on June 1, 1983, and all of the remaining lease payments were covered by non-negotiable notes due on February 1, 1990. Mr. Kwiatowski was not personally liable for payment of the major part of the principal and interest on the notes, but he had to execute an assignment to Philatelic of 50 percent of the net receipts from all sales of the stamps. Such net receipts were to be accounted for and paid over semi-annually, and the distribution company that was engaged to market the stamps was irrevocably authorized to pay Philatelic 50 percent of all amounts to which Mr. Kwiatowski might become entitled. The lease reflects a payment to Philatelic of $2,000 to cover the cost of having the stamps printed. Mr. Kwiatowski also entered into a distribution agreement with defendant Dell Philatelic Consultants, Ltd., contracting to pay Dell $500 upon the signing of the agreement, $1,450 two months later, $250 from initial stamp sales, and 25% of all receipts from subsequent sales.
 
 
 18
 The lease agreement recited that the stamp master had cost Philatelic $150,000. Philatelic agreed to make an election "to pass through the investment tax credit relative to the Master to the Lessee...." The investment tax credit would be 10 percent of Philatelic's cost, as we understand it, if that cost represented the property's fair market value on the date possession was transferred to the lessee--so Mr. Kwiatowski could expect to receive a direct credit against his personal income tax liability in the amount of $15,000 if the master was worth what Philatelic purported to have paid for it.
 
 
 19
 In addition to the investment tax credit, the taxpayer expected to obtain a tax deduction for his lease payments, including the portion of the notes qualifying as deductible under the "at risk" rules and, we assume, the net receipts that had to be paid over to Philatelic in satisfaction of the nonrecourse notes. Finally, fees paid for having the stamps printed and marketed were also expected to be deductible, although Philatelic's promotional literature pointed out that "production costs are not deductible when incurred but must be assigned to products produced and deducted upon their sale."
 
 
 20
 Philatelic marketed the tax shelter, according to the Second Circuit opinion, through a nationwide force of three to four hundred commissioned salespersons. Philatelic Leasing, 794 F.2d at 783-84. Defendant Robert V. Yeo, Jr., a certified public accountant, is claimed to have been such a commissioned salesperson, although Plaintiff John C. Collins swore in an affidavit that Yeo told him he received no commissions from Philatelic. Be that as it may, it is apparently undisputed that while acting as an accountant and tax adivsor for the plaintiffs, Mr. Yeo enthusiastically recommended Philatelic's tax shelter to them. According to the Collins affidavit, Mr. Yeo said it "was the best tax shelter he had ever seen and [he] had even invested in it himself." Mr. Yeo allegedly told Plaintiffs Collins, Newmyer, and O'Connell that the Philatelic program had a four-dollar tax write-off for each dollar invested. An "illustration of tax consequences" set forth in Philatelic's literature suggests that an investor in the 50 percent tax bracket could get tax credits and deductions equivalent to a write-off of approximately four times the investor's 1982-83 cash outlay.
 
 
 21
 Several of the plaintiffs were invited to a Philatelic sales presentation attended, according to one affidavit, by about 25 of Mr. Yeo's clients. At this meeting, which was held at the Detroit Athletic Club in November of 1982, the promoters allegedly described the market for the stamps as "strong." Each of the plaintiffs received an "offering memorandum" describing the program in detail and incorporating, among other things, a tax opinion letter prepared by defendant Friedman and Shaftan, P.C., a New York law firm. The offering memorandum also included letters in which the law firm and defendant Trager, Glass & Company, a New York firm of certified public accountants, confirmed that they had agreed to represent Philatelic in connection with any challenge by the Internal Revenue Service to the tax structure of the transaction set forth in the memorandum.
 
 
 22
 With respect to the key question of the value of the stamp masters in Philatelic's hands, the tax opinion incorporated in the offering memorandum had this to say:
 
 
 23
 "In each case Hambrose will deliver to Philatelic reports from two stamp dealers, acting as appraisers of the Stamp Master, who are knowledgeable in the local stamp industry as to the value of the Stamp Master.... These Appraisals will then by furnished by Philatelic to each Lessee. The Appraisals, taken together, indicate that the estimated fair market value of the Stamp Master is at least equal to the Purchase Price paid by Philatelic. The Appraisals suggest that, while an investment in a Stamp Master is highly speculative, there is a reasonable likelihood that the sales from exploitation of the Stamp Master will be sufficient to repay the Notes (and repay the Obligations) and to generate profits to Philatelic and Lessees."
 
 
 24
 Under the caption "Printing of Stamps," the offering memorandum explained, among other things, that
 
 
 25
 "Philatelic, as agent for the Lessee, will arrange for a maximum of two printings of stamps (if the Lessee so desires). The production fee is $2,000 for a two-stamp or four-stamp master, $2,500 for a six-stamp master and $3,000 for [an] eight-stamp master."
 
 
 26
 None of the plaintiffs had any prior experience in the stamp business, and each plaintiff elected to have Philatelic arrange for printing.
 
 
 27
 Under the caption "Distribution," the offering memorandum explained how stamp distributors typically operate and noted that although some lessees might elect to handle the task of distribution on their own, "the vast majority of Lessees are likely to select an established distribution company." A number of distribution companies were said to be "readily available." The memorandum added that "Philatelic cannot be a party to negotiations with these distributors."[4]
 
 
 28
 Under the guidance of Defendant Yeo, who had allegedly followed this course himself, Plaintiffs Newmyer, Kwiatowski, and Collins all signed preprinted distribution agreements engaging defendant Dell Philatelic Consultants, Ltd. as "the exclusive marketing agent of Lessee for the Stamps." Dell agreed to use "reasonable efforts" to sell the stamps, but there was to be no "minimum sales guarantee or obligation." (Plaintiff O'Connell also intended to market the stamps through a professional stamp company, according to his affidavit, "but we never signed the papers because the federal government intervened in the tax shelter.")
 
 
 29
 On June 13, 1983, the United States filed its lawsuit against Philatelic, Hersch, Hambrose, and Global for "promoting abusive tax shelters" in violation of 26 U.S.C. Sec. 6700.[5] A settlement was reached with Global, but the case against the other defendants went to trial and culminated in a judgment, entered in 1985, wherein the remaining three defendants were found to have made "gross valuation overstatements" in connection with the organization and sale of the Philatelic tax shelter.
 
 
 30
 District Judge Knapp found that "the masters themselves had no substantial value." 601 F.Supp. at 1567. The court of appeals, in affirming, said that it was hard to see how he could have found otherwise, in light of the evidence. 794 F.2d at 785. Whether the defendants were part of a conspiracy was not at issue in the government's case, notwithstanding some "unnecessary" observations by Judge Knapp on the nature of the relationship among the defendants, "but the legitimate meaning of his decision comes through loud and clear--the tax shelter sold by the appellants was a sham and the appellants knew it." Id. The judgment entered by Judge Knapp and affirmed by the Second Circuit enjoined Philatelic, Hambrose, and Hersch from continuing to offer the Philatelic tax shelter for sale and from otherwise engaging in conduct (such as organizing or selling interests in any other investment plan or partnership involving gross valuation overstatements) proscribed by the language of 26 U.S.C. Sec. 6700.
 
 
 31
 In tax filings prepared, in part, by Defendant Yeo, the plaintiffs in the present cases claimed a variety of tax deductions and credits in connection with their investments, all of which deductions and credits were disallowed by the Internal Revenue Service. The IRS also asserted claims for penalties and interest. In their affidavits, plaintiffs put their total estimated liability to IRS at two or three times the amount of their total cash investments.
 
 
 32
 The plaintiffs filed virtually identical lawsuits against Philatelic et al. in the United States District Court for the Eastern District of Michigan, asserting claims under Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j, and under RICO, among other things, along with pendent common law claims for fraud and deceit, civil conspiracy, negligence, malpractice, and breach of contract. The defendants asserted a variety of defenses, including, in some cases, lack of personal jurisdiction; the only defenses that concern us here, however, involve jurisdiction over the subject matter of the actions and, in the case of the RICO counts, a supposed failure to state a claim upon which relief can be granted. These defenses were raised by way of motions to dismiss filed under Rule 12, Fed.R.Civ.P.
 
 
 33
 The motions were referred to a magistrate. In a well-written report, the magistrate recommended dismissal of the federal securities fraud claims on the ground that the plaintiffs' lease and security agreements did not quailify as "securities." The magistrate recommended dismissal of the RICO claims on the theory--adopted by the Eighth Circuit in Deviries v. Prudential Bache Securities, Inc., 805 F.2d 326 (8th Cir.1986)--that RICO applies only where the predicate acts of misconduct occur in separate fraudulent schemes. And the magistrate recommended dismissal of the state law claims, without prejudice, pursuant to the general rule that pendent jurisdiction should not normally be exercised after all federal claims had been dismissed prior to trial. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The district court adopted the magistrate's report and recommendation without elaboration, and the plaintiffs appealed. The appeals have been consolidated.
 
 II
 
 34
 In its current form, the 1934 Securities Exchange Act's definition of a "security" covers, among other things,
 
 
 35
 "... any note, stock, treasury stock, bond, debenture, certificate of deposit or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract ... or in general, any instrument commonly known as a 'security'...."
 
 
 36
 The definition in the 1933 Securities Act, 15 U.S.C. Sec. 77b(1), is similar, as the Supreme Court has noted. Tcherepnin v. Knight, 389 U.S. 332, 335-36, 88 S.Ct. 548, 552-53, 19 L.Ed.2d 564 (1967).
 
 
 37
 Originally, neither statute listed oil and gas leases, eo nomine. In a 1943 decision written by Mr. Justice Jackson, however, the Supreme Court held that notwithstanding this omission, the Securities Act of 1933 covered resales of certain oil and gas leases that were marketed through a nationwide mail compaign. SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). The advertising literature used in Joiner "emphasized the character of the purchase as an investment and as a participation in an enterprise," and the value of each lease was claimed to be enhanced by the vendor's commitment to drill an exploratory well so located as to test the oil-producing possibilities of the offered leaseholds. Id. at 346, 64 S.Ct. at 121. This was enough to bring the offering within the purview of the 1933 Act, in the Court's view.
 
 
 38
 Although defendant Philatelic, the lessor in the present cases, did not itself undertake to do anything directly comparable to the drilling of the test well in Joiner, the Joiner decision does make it clear that the failure of Congress to mention "leases" in its laundry list of securities does not mean that all leases were necessarily excluded from the statutory definition. One of the appellants in the instant cases points out that a "cursory review" of the statutory definitions "indicates that they do not include the term 'stamp lease.' " That is true, but Joiner teaches that "[n]ovel, uncommon or irregular devices, whatever they appear to be, are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security." ' " Id. at 351. Thus the "stamp leases" sold byPhilatelic, novel though they undoubtedly were, could also be reached by the statute if they were widely offered under courses of dealing that establish their character as "investment contracts."
 
 
 39
 A novel device that may well have borne an affinity to the tax shelter at issue here was held to be an investment contract, and thus a security under the 1933 Act, in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Howey Company, which owned large tracts of citrus acreage in Florida, offered to sell narrow strips of land in its citrus groves to prospective investors in other states. Investors were promised a warranty deed to the land. They were also given the option--but were not required--to lease their strips of land to a service company controlled and managed by the same people who controlled and managed the Howey Company. Investors who selected this option could have the service company cultivate the land and harvest and market the crops under the service contract. About 85 percent of the acreage sold by Howey was covered by such service contracts.
 
 
 40
 The question presented in Howey was whether, under the facts as stipulated by the parties, the land sales contract, warranty deed, and service contract together constituted an "investment contract" under the 1933 Act. Concentrating on economic realities, and emphasizing substance over form, the Court answered this question in the affirmative.
 
 
 41
 The investors in Howey, the Court noted, were "predominantly business and professional people who lack[ed] the knowledge, skill and equipment necessary for the care and cultivation of citrus trees." 328 U.S. at 296, 66 S.Ct. at 1101. The plaintiffs in the case at bar, similarly, may be presumed to lack the knowledge and skill necessary for the marketing of stamps to collectors. The investors in Howey were "attracted by the expectation of substantial profits." Id. Although the plaintiffs in the case at bar were attracted in part by the expectation of substantial tax advantages, it is certainly open to them to try to prove they had a profit motive too. (As Philatelic's offering memorandum explained very clearly, indeed, if the stamp operation were not "engaged in for profit (aside from tax savings)," the tax advantage would not be available--and "[w]here the facts of the transaction indicate that no profits are possible or that such profits are unlikely, the activity will be considered to lack the requisite profit motive, particularly if the transaction has substantial tax avoidance motivations.")
 
 
 42
 In substance, if not in form, the individual investors in Howey "were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves." Id. at 298, 66 S.Ct. at 1102. The Howey scheme thus fit the "investment contract" definition applied by the state courts in a variety of situtations under state blue sky laws--which, as the Court observed, was the definition underlying the decision in Joiner. 328 U.S. at 298-99, 66 S.Ct. at 1102-03. That definition, the Howey court went on to say, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id. at 299, 66 S.Ct. at 1103. And the definition was flexible enough to cover the Howey offering notwithstanding that the investors in 15 percent of the acreage declined to enter into optional service contracts with the Howey company's affiliate: "It is enough that the respondents merely offer the essential ingredients of an investment contract." Id. at 301, 66 S.Ct. at 1104 (emphasis supplied).
 
 
 43
 In the case at bar, the plaintiffs have alleged that the defendants Yeo, Philatelic and Dell were all participants in a common conspiracy. Philatelic and Dell were not under common ownership and did not have common directors and officers, but that would not of itself preclude a finding that the two companies were acting in concert. If they were, and if Mr. Yeo was acting on their behalf, the distribution contract recommended by Mr. Yeo would seem to be the functional equivalent of the service contract offered by the service company affiliate in Howey.[6] The plaintiffs in the instant cases were no more equipped to distribute stamps produced from the plates leased from Philatelic than the Howey investors were equipped to distribute oranges grown on the land purchased from the Howey company. In both situations, as a practical matter, the investors had to rely on the efforts of others to do the necessary selling. And if the plaintiffs in the present litigation are able to prove their cases, the commitment given by the distribution company here, like that given by the service company in Howey, would bear a strong resemblance to the undertaking to drill an exploratory oil well in Joiner.
 
 
 44
 No comparable commitment to activity calculated to help investors realize a profit could be found in United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), a decision in which the Supreme Court emphatically reaffirmed Howey and Joiner. The question in Forman was whether the statutory definition of securities covered shares that entitled a purchaser to lease an apartment in a subsidized non-profit housing cooperative. As far as the "investment contract" aspect of this question was concerned, the Court declared, it was necessary to "examine the substance--the economic realities of the transaction--rather than the names that may have been employed by the parties." 421 U.S. at 851-52, 95 S.Ct. at 2060. Quoting Howey, 328 U.S. at 301, 66 S.Ct. at 1104, the Court said that the "basic test" for distinguishing an investment contract from other commercial dealings is "whether the scheme involved an investment of money in a common enterprise with profits to come solely from the efforts of others." 421 U.S. at 852, 95 S.Ct. at 2060.
 
 
 45
 The Forman court, speaking through Justice Powell, continued as follows:
 
 
 46
 "This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in Joiner ... or a participation in earnings resulting from the use of investors' funds, as in Tcherepnin v. Knight, [389 U.S. 332, 88 S.Ct. 548].... By contrast, when a purchaser is motivated by a desire to use or consume the item purchased--'to occupy the land or to develop it themselves,' as the Howey court put it, ibid.--the securities laws do not apply." Id. at 852-53, 95 S.Ct. at 2060-61 (footnotes omitted).
 
 
 47
 In Forman there could be "no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not financial returns on their investments." Id. at 853, 95 S.Ct. at 2062. If the plaintiffs in the instant cases had leased stamp masters solely for the purpose of producing stamps for their own pleasure, without any thought of capital appreciation or earnings from stamp sales, Forman makes it clear that the securities laws could have no application here. But the fact that most of the plaintiffs engaged defendant Dell to sell their stamps for them suggest rather strongly, we think, that the plaintiffs were not motivated by a quixotic desire to paste hundreds of thousands of identical stamps in their own albums.
 
 
 48
 Randall v. Loftsgaarden, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), the final Supreme Court decision that we shall discuss on the securities question, involved a defrauded tax shelter investor who was questionably entitled to some measure of relief under the securities laws. The issue addressed by the Supreme Court was whether the tax benefits realized by the investor should be offset against his recovery of recisionary damages under 15 U.S.C. Sec. 771(2), a section of the 1933 Act allowing a defrauded investor to recover what he paid for the security, with interest, "less the amount of any income received thereon...."
 
 
 49
 Ruling in favor of the defrauded investor, the Supreme Court held that the money that the taxpayer had been enabled to keep out of the hands of the tax collector--money earned by the taxpayer through his own labor or as a return on other investments, rather than as a return on the investment in the tax shelter--did not constitute "income" received on the tax shelter investment. "[T]he 'receipt' of tax deductions or credits is not itself a taxable event," said Justice O'Connor, speaking for the Court, "for the investor has received no money or other 'income' within the meaning of the Internal Revenue Code." 478 U.S. at 657, 106 S.Ct. at 3149. Justice O'Connor found additional support for this conclusion in Forman, where the Court had rejected a claim that the deductibility of the mortgage interest component in the monthly rental paid by the apartment dweller converted his purchase of the right to lease the apartment into an "investment contract" potentially capable of producing income or profits. Loftsgaarden, 478 U.S. at 657, 106 S.Ct. at 3149, citing Forman, 421 U.S. at 854-55, 95 S.Ct. at 2061-62.
 
 
 50
 The defendants in the present litigation cite Forman and Loftsgaarden in arguing that there was no "investment contract" here because there was no reasonable expectation of profits to be derived from the efforts of others. We agree that there cannot be an investment contract without some hope of profits produced by the efforts of others, and we agree also that tax benefits alone cannot satisfy the profit requirement. Having read Philatelic's offering memorandum, however, with its glowing account of the popularity of stamp collecting, we cannot rule out the possibility that Philatelic's investors hoped to realize "profits" in the true sense of the term. The presence or absence of a profit motive is a question of fact, of course--and in resolving that question, we are sure, the trier of fact will not be unmindful of the appraisals furnished by Philatelic to show that, in the words of Messrs. Friedman and Shaftan, "there is a reasonable likelihood that sales from the exploitation of the Stamp Masters will be sufficient to pay all the Notes and to generate profits to the Lessee." It is awkward, to say the least, for the defendants to maintain that a profit motive does exist when it comes to applying the Internal Revenue Code, but not when it comes to applying the securities laws. See SEC v. Professional Associates, 731 F.2d 349, 356 (6th Cir.1984), where this point was made in connection with tax shelters involving joint ventures formed to exploit leased phonograph record masters.
 
 
 51
 Finally, we come to the vexed question of whether there is any prospect of the plaintiffs being able to show not only a "common venture," but a common venture in which the plaintiffs' funds were pooled with those of other investors. This circuit, following the lead of Judge Stevens (as he then was) in Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir.1972), has repeatedly said that proof of a vertical relationship between seller and buyer is not in itself enough to establish the existence of investment contracts; there must also be a horizontal relationship between or among investors, with the funds of two or more investors going into a common pool from which all may benefit. Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 622 F.2d 216, 221-22 (6th Cir.1980), aff'd on other grounds, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc., 651 F.2d 1174, 1183 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); Hart v. Pulte Homes of Michigan Corp., 735 F.2d 1001, 1003-05 (6th Cir.1984).
 
 
 52
 If the plaintiffs in the instant cases can show a common enterprise among defendants Yeo, Philatelic and Dell, it may well prove to be a relatively simple matter for the plaintiffs to satisfy the "horizontal commonality" test. It is undisputed that most of the plaintiffs paid Dell to distribute their stamps. We have no reason to suppose that the marketability of one plaintiff's stamps differed materially from the marketability of another's,[7] and it is entirely possible that if Dell had used the plaintiffs' money to advertise or otherwise promote these local stamps, developing a real market for them, all of the plaintiff investors would have benefited, just as all of the investors in Howey stood to benefit from the service company's successful marketing of their oranges. These are factual questions, again, and the defendants may ultimately prevail on them. But such questions are not to be resolved against the plaintiffs on motions to dismiss--at least not on the sort of record that is before us here.
 
 
 53
 If the plaintiffs ultimately fail to substantiate their claim that the defendants were acting in concert, they are likely to find it more difficult to establish the requisite horizontal commonality. We are not ready to hold at this point that such a showing would be impossible, however.
 
 
 54
 All of the plaintiffs paid money to Philatelic, of course, and Philatelic stood to receive far larger amounts, under the lease and security agreements, if the world happened to develop the same appetite for local postage stamps that it has shown, on occasion, for such unlikely collectables as pet rocks, op art, and anything remotely connected with the late Mr. Elvis Presley. The fortunes of Philatelic were directly linked to the success or failure that the stamps enjoyed in the retail marketplace. This consideration leads us to disagree, respectfully, with the conclusion reached in Nakagawa v. Ellis & Ellis, Fed.Sec.L.Rep. (CCH) p 93,028 (U.S.D.Ct., D.Hawaii 1986), where the same tax shelter with which we are concerned here was held not even to meet the "vertical commonality" test used in the Ninth Circuit's investment contract cases.
 
 
 55
 In Nakagawa the district court found that Philatelic "was to derive its profits from the initial leasing of the stamp masters," no evidence having been produced "to show that Philatelic participated in any profits from the printing, sale, or distribution of stamps printed from stamp masters." It seems to us that this finding overlooks paragraphs 5(a)(4) and 12 of the terms and conditions of the lease and security agreement, which make it clear that until such time as the nonrecourse notes constituting the bulk of the consideration might be paid in full, Philatelic was entitled to future payments of 50 percent of whatever net receipts were realized on sales of the stamps. Philatelic and its creditors were in a position to benefit hugely if those sales really took off.
 
 
 56
 Whether there is also a horizontal dimension to the commonality inherent in the arrangements linking Philatelic and the investors depends, we believe, on whether Philatelic was committed to action that might benefit the investors as a group. There are several possibilities in this regard, the most significant of which would seem to be (1) that Philatelic was committed to paying the bulk of its receipts over to Hambros, and (2) that Philatelic was committed to paying for a defense of the tax structure if the government brought an attack such as that launched in the Southern District of New York in 1983.
 
 
 57
 Philatelic's commitment to pay Hambros might well have a bearing on the actual value of the masters. Although it is value at the time of delivery that is significant for tax purposes, the plaintiffs argue that by the time a court reached the stage of actually determining value, the masters would have a revenue-production history that could be relevant to the valuation question. The value of stamp masters is a question of fact, as Philatelic's offering memorandum accurately observes, and had it developed that Hambros, which sold the masters to Philatelic, was actually receiving revenues at a rate that might enable it to collect the very high prices that Philatelic had contracted to pay, we presume it would have been harder for the government to show that those prices were a sham. (This assumes, of course, that there is not much difference between stamps of one design and stamps of another--that stamps depicting the caves of the Island of Staffa, for example, would be about as marketable as stamps depicting the flora or fauna of the Island of Bernera. See n. 7 supra.)
 
 
 58
 A variant of this argument has been accepted by some district courts--see, e.g., Kolibash v. Sagittarius Recording Co., 626 F.Supp. 1173 (S.D.Ohio 1986), and In re Energy Systems Equipment Leasing Securities Litigation, 642 F.Supp. 718 (E.D.N.Y.1986)--and it has been rejected by others. See, e.g., Wells v. Jackie Fine Arts, Inc., Case No. C-2-86-0374, U.S.D.Ct., S.D.Ohio, Sept. 25, 1987, where defendant Herman Finesod was among those sued. See also Lakshmikanth v. Philatelic Leasing Ltd., No. 3-83-0710, M.D.Tenn., Oct. 12, 1983 (holding Philatelic's tax shelter not a "security" because profits were not "to be derived from the entrepreneurial or managerial efforts of others.") Like the contention that horizontal commonality can be shown through Philatelic's commitment to defend the tax structure in court, the argument depends on the conclusion that a pooling of interests in the hope of securing tax benefits will satisfy the commonality requirement even though it cannot, by itself, satisfy the expectation of profits requirement. Where the Supreme Court would come out on that question--assuming the Court agrees with us that horizontal commonality must be shown--we do not know. We need not come to grips with the issue here, however, given the clear possibility that at a trial of these cases, or in summary judgment proceedings, the plaintiffs may be able to show that their arrangements with Dell got them over the commonality hurdle.
 
 III
 
 59
 We turn now to RICO. A section of that statute patterned on Sec. 16 of the Clayton Act provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. Sec. 1962] may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit...." 18 U.S.C. Sec. 1964(c).
 
 
 60
 The plaintiffs in the instant cases contend that they were injured in their business or property by reason of violations of three separate subsections of 18 U.S.C. Sec. 1962. The first is Sec. 1962(a), which provides, in pertinent part, as follows:
 
 
 61
 "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to sue or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."
 
 
 62
 The district court held as a matter of law that the plaintiffs could not have been injured in their business or property by any violation of Sec. 1962(a) "because there is simply no way that Plaintiffs could have been damaged by what Defendants did with their money after receipt of the lease payments." (Emphasis in original.) This conclusion is erroneous, in our view, because it overlooks the possibility that the offering of the particular investment plan in which the plaintiffs put their money may have been financed with the proceeds of prior "racketeering activity." The plaintiffs' complaints alleged that the defendants had been acting in concert over a period of five years, defrauding hundreds of taxpayers in addition to the plaintiffs; that in furtherance of their fraudulent scheme, the defendants had used the mails and facilities for wire communications to transmit false and misleading information within a ten-year period; and that such acts of mail fraud, wire fraud and securities fraud constituted a pattern of racketeering activity. If these allegations are true, and if the defendants used income derived from racketeering activity in 1980 and 1981 to establish and operate the alleged scam in which the plaintiffs put their money in 1982 and 1983, we do not see why it would be impossible for the plaintiffs to show that they had been injured by a violation of Sec. 1962(a).[8]
 
 
 63
 The district court also held as a matter of law that there could be no "pattern of racketeering activity," within the meaning of that phrase as used in 18 U.S.C. Sec. 1962(a), because the acts of mail fraud, wire fraud and securities fraud that were claimed to form the "pattern" all constituted part of a single scheme. In so holding, the district court adopted an interpretation of RICO endorsed by the Court of Appeals for the Eighth Circuit in cases such as Superior Oil v. Fulmer, 785 F.2d 252 (1986), Deviries v. Prudential-Bache Securities, Inc., 805 F.2d 326 (8th Cir.1986), Ornest v. Delaware North Cos., 818 F.2d 651 (8th Cir.1987), and H.J. Inc. v. Northwestern Bell Telephone Co., 829 F.2d 648 (8th Cir.1987).
 
 
 64
 Judge John R. Gibson, concurring separately in the opinion last cited, expressed the view that "the multiple scheme requirement that we [the Eighth Circuit] have grafted onto the pattern element strays from the statutory language of RICO;" Judge Gibson urged that "the multiple scheme requirement should be examined by the court en banc." 829 F.2d at 651. It was not the Eighth Circuit that examined the multiple scheme requirement en banc, as matters developed, but the Supreme Court. In a decision handed down in June of this year, subsequent to the district court's decision in the cases at bar, the Supreme Court reversed the Eighth Circuit's judgment in Northwestern Bell and flatly rejected the multiple scheme requirement. H.J. Inc. v. Northwestern Bell Telephone Co., --- U.S. ----, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).[9]
 
 
 65
 The Supreme Court's decision in Northwestern Bell clearly requires that we reverse the judgment in the present litigation insofar as the district court held that to be capable of forming a "pattern of racketeering activity" under RICO, the predicate criminal acts must have been committed in more than one fraudulent scheme. The district court applied the "multiple scheme" requirement not only in connection with 18 U.S.C. Sec. 1962(a), but also in connection with Secs. 1962(c) and (d), the other two subsections on which the plaintiffs rely.[10] The plaintiffs must be given an opportunity to show, if they can, that they were injured by reason of violations of all three subsections.
 
 
 66
 Defendants Trager, Glass and Robert Yeo argue that the dismissal of the RICO claim must be affirmed because the complaints failed to allege the existence of an "enterprise" distinct from the defendant "persons" and distinct from the alleged pattern of racketeering activity. It is true that a RICO "enterprise" must be separate and different from the "persons" participating in the enterprise. Fleischhauer v. Feltner, 879 F.2d 1290, 1297 (6th Cir.1989). "Only 'persons' can be held liable for RICO violations; the 'enterprise' itself is not liable." Id. The complaints in the present cases allege that each of the defendants is a "person" within the meaning of 18 U.S.C. Sec. 1962 and that Philatelic was an "enterprise" engaged in affecting interstate or foreign commerce.
 
 
 67
 The complaints may have been defective insofar as they identify Philatelic as both a "person" and an "enterprise." But this defect, if defect it be, is material only to the claim against Philatelic; it is immaterial to the claims against the other defendants. And insofar as the RICO claim against Philatelic is concerned, we see no reason why the supposed pleading defect would not be readily correctable by amendment.
 
 IV
 
 68
 After oral argument, the defendant-appellees moved for leave to brief the constitutionality of RICO. Prompted by dicta in both the majority and concurring opinions in the Supreme Court's Northwestern Bell Telephone decision, the defendants wish to argue, for the first time, that this "sprawling, amoeba-like statute," as it has been called,[11] is void because of the vagueness of the "pattern" requirement.
 
 
 69
 As a rule, this court declines to entertain arguments not presented in the first instance to the district court. Sigmon Fuel Co. v. TVA, 754 F.2d 162, 164 (6th Cir.1985). The Supreme Court has told us that "a federal appellate court is justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt, or where 'injustice ... might otherwise result.' " Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (citations and footnote omitted). The proper resolution of the question of RICO's constitutionality is not beyond any doubt, and no injustice would result from allowing the issue to be addressed in the first instance by the district court in the context of a properly developed record.
 
 
 70
 The motion for leave to file a supplemental brief is DENIED. The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 ORDER ON REHEARING
 
 71
 The court having received a petition for rehearing with a suggestion for rehearing en banc, and the petition having been circulated not only to the members of the original panel but also to all other active judges of this court, and no judge having requested a vote on the suggestion for rehearing en banc, the petition has been referred to the original panel.
 
 
 72
 The petition asserts that the panel decision is contrary to the holdings of this court in Deckebach v. La Vida Charters, Inc. of Florida, 867 F.2d 278 (6th Cir. 1989), and Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980), aff'd on other grounds, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The panel fully considered the holding in Curran upon the original submission and decision of the present cases, and the panel remains of the view that at this stage of the litigation, at least, Curran is not dispositive. Deckebach was not cited in the original panel decision, and it is appropriate that we address Deckebach here.
 
 
 73
 The plaintiffs in Deckebach, a married couple, bought a yacht from La Vida Charters under a purchase agreement drafted by their own counsel. The Deckebachs' ultimate goal, after the yacht was paid for, was to use the vessel solely for personal purposes. To help finance the purchase, however, the Deckebachs enterd into a management agreement with La Vida Management, an affiliate of La Vida Charters. The management agreement, which was terminable by either side on 60 days notice, provided that the management company would maintain the yacht and arrange for its charter to third parties when the Deckebachs were not using it. La Vida Management had similar arrangements with the owners of other vessels, and as charter opportunities presented themselves, La Vida gave priority to vessels that had been available for the longest period of time.
 
 
 74
 The Deckebachs sued the La Vida company and others under the federal securities laws. On motion for summary judgment, the district court concluded that the arrangement for purchase and management of the yacht did not come within the statutory definition of a 'security.' This court, conceding that the case presented 'a difficult and close question of law,' 867 F.2d at 284, affirmed the district court's judgment.
 
 
 75
 The instant litigation also presents close and difficult questions. Viewing the matter in the light most favorable to the plaintiffs, however, as we must do because the complaints were dismissed under Rule 12(b)(6), Fed.R.Civ.P., it seems to us that the lawsuits against Philatelic Leasing et al. come a good deal closer to the Supreme Court's citrus grove case, SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), than the Deckebachs' lawsuit against the La Vida companies did.
 
 
 76
 The Deckebach panel stressed that the citrus grove enterprise in Howey was partly owned by the defendants, and the financial success of the individual investors was linked to the financial success of the defendants. That was not true in Deckebach, where 'La Vida had no ownership interest in the various yachts ... and failure of the La Vida business operation would not have caused the yacht owners necessarily to fail and to lose use of their vessels." 867 F.2d at 283. In the cases at bar, by contrast, defendant Philatelic Leasing did retain an ownership interest in the various stamp masters, and the evidence may well show that if the money taken in by defendant Dell Philatelic had been used to promote local stamps successfully, all investors would have benefited, along with Dell and the entities with which Dell was allegedly acting in concert. Conversely, of course, the failure of Dell/Philatelic Leasing to receive any significant revenues from sales of the local stamps that were produced from the masters made it highly likely that all investors, regardless of their individual financial resources, would lose the substantial tax advantages that represented a principal inducement - if not the principal inducement - for the leasing of the masters. There was no corresponding link among the yacht owners in Deckebach; the success of the La Vida enterprise and its ability to attract charters had only an indirect impact upon the individuals contracting with La Vida.' 867 F.2d at 283.
 
 
 77
 It is also significant that the plaintiffs in Deckebach bought their yacht for personal use; they admittedly wanted to have it available 'essentially at their complete discretion.' Id. at 284. The Deckebach panel noted that this factor - which has its analogue in United Housing Foundation Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), where a contract to buy a cooperative apartment was held not to constitute a 'security' - 'distinguishes the case from the facts in Howey.' Id. In Howey, the Supreme Court said that the investors had 'no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment.' 328 U.S. 299-300, 66 S.Ct. 1103-04, as quoted at 867 F.2d 283. The investors in the present cases, as we must assume at this point, likewise had no desire to take personal possession of the stamp masters or use the masters themselves; unlike the plaintiffs in Deckebach, the plaintiffs here were attracted solely by the prospect of tax savings and a return on their investment.
 
 
 78
 The purchase of the yacht in Deckebach, as this court said in further distinguishing Howey, was not simply 'an investment in a charter business, with ownership rights in the yacht being merely incidental.' 867 F.2d at 284. The investment in stamp master leases, on the other hand, could well be found to have been an investment in a philatelic business, with leasehold rights in the masters being merely incidental.
 
 
 79
 The Deckebach panel conceded that '(f)inancing a yacht purchase by generating rental income depended, to some extent, upon the availability of yachts together under common management,' id. at 283, but the panel discounted that aspect of the case because the management arrangement was 'mandated only for a short period (i.e., 60 days).' But the distribution agreement that all but one of the plaintiffs in the present cases signed with defendant Dell Philatelic was terminable only after the fourth year. It is true that no investor was required to sign a distribution agreement with Dell, but no investor was required to sign a management agreement in Howey - and a significant percentage of the investors in Howey did not sign such agreements.
 
 
 80
 On balance, it seems to us, Deckebach merely highlights the similarities between the present litigation and Howey. We see no conflict between our prior decision here and the decision in Deckebach. The petition for rehearing is DENIED.
 
 
 
 [1]
 Outside the tax shelter industry, the island's chief claim to fame, according to defendant Philatelic's promotional literature, is its numerous caves. One of these grottos--"the legendary Fingal's Cave"--is said to have inspired Mendelsohn's Hebrides Overture. (Professor Jonathan Kramer tells us, however, that the opening theme of the overture was in fact written before Mendelsohn visited Staffa.)
 The caves of Staffa have long attracted tourists, but Dr. Johnson found little interest in them among the nearby islanders. The indifference of the locals to these natural curiosities prompted the bemused Englishman to commit the following reflections to paper:
 "When the islanders were reproached with their ignorance, or insensibility of the wonders of Staffa, they had not much to reply. They had indeed considered it little, because they had always seen it; and none but philosophers, nor they always, are struck with wonder, otherwise than by novelty. How would it surprise an unenlightened ploughman, to hear a company of sober men, inquiring by what power the hand tosses a stone, or why the stone, when it is tossed, falls to the ground!" Samuel Johnson, A Journey to the Western Islands of Scotland (1st ed. 1775).
 
 
 [2]
 These informative opinions, the first by District Judge Knapp and the second by Circuit Judge Oakes, were issued in a lawsuit brought by the United States in an effort--a successful effort, as it turned out--to close down Philatelic Leasing's tax shelter operations under the Tax Equity and Fiscal Responsibility Act of 1982
 
 
 [3]
 An affidavit by the president of defendant Philatelic Leasing says that Philatelic, at least, was not affiliated with Dell in any way and that Philatelic and Dell had no common officers, directors, employees, or shareholders. The plaintiffs, on the other hand, allege that all of the defendants were participants in a common conspiracy and that they were acting in concert
 
 
 [4]
 A somewhat similar disclaimer may be found in the offering memorandum involved in SEC v. Aqua-Sonic Products Corp., 524 F.Supp. 866, 870 (S.D.N.Y.1981), aff'd, 687 F.2d 577 (2d Cir.), cert. denied sub nom. Hecht v. SEC, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). That memorandum said that the licensor "takes no position" on the matter of retaining sales agents--but, as we shall see, the scheme involved there was held to be an investment contract nonetheless
 
 
 [5]
 Section 6700 authorizes the imposition of penalties against persons who organize or sell interests in any partnership or "any investment plan or arrangement" or any other plan or arrangement and in connection therewith make a false statement on tax benefits or make "a gross valuation overstatement as to any material matter." The term "gross valuation overstatement" is defined as a statement as to the value of property directly related to the amount of a tax deduction or credit, where the value stated exceeds 200 percent of the amount determined to be the correct valuation
 
 
 [6]
 We pause here to note some of the possible parallels between the instant scheme and that involved in SEC v. Aqua-Sonic Products Corp., 687 F.2d 577 (2d Cir.1982), cited in n. 4, supra. In that case--which, like the instant litigation, saw Melvin Hersch named as defendant--purchasers of a tax shelter involving licenses for the manufacture and distribution of dental devices were offered an optional sales agency agreement with a corporation called Ultrasonic. The licensor was a corporation called Aqua-Sonic. The corporations were wholly owned by their respective principal officers--each of whom was the sole shareholder of his corporation, see 524 F.Supp. at 868--but the men were undoubtedly acting in concert. Licenses were sold through CPAs and the like to investors with no prior experience in selling dental products. If a licensee elected to sign a sales agency agreement with Ultrasonic, that company would undertake to perform functions comparable to those assigned to the service company in Howey and to defendant Dell in the present litigation. Notwithstanding that the sales agency agreement was optional--and the promoters' offering memorandum "did not mention an offer by anyone to act as a sales agent," see 524 F.Supp. at 870--the Second Circuit, speaking through Judge Friendly, found no error in the district court's conclusion that the investors expected to derive profits from the efforts of others and thus had entered into "investment contracts." Contracts were being offered to precisely the type of investor for whose benefit the securities laws were enacted, the Second Circuit noted, and while the totality of the circumstances must always be considered in determining where a particular scheme falls in relation to the line that divides "investment contracts" from contracts not covered by the broad definition of a security, "we have not the slightest doubt on which side of the line this case falls." 687 F.2d at 585. "[I]n light of the economic realities of this case and the precedents in the Supreme Court, in the state courts prior to adoption of the 1933 Act, and in the courts of appeals thereafter, the Aqua-Sonic scheme was an 'investment contract' and therefore a 'security.' " Id
 
 
 [7]
 In 1982 alone, it may be recalled, Philatelic sold rights to produce local stamps with more than 1600 different designs; there is no reason to suppose that these stamps were not more or less fungible
 
 
 [8]
 The complaints' averments of mail fraud and wire fraud are not "stated with particularity," as required by Rule 9(b), Fed.R.Civ.P., but the district court noted that "given the otherwise detailed description of the scheme, it would appear Plaintiffs could supply the specifics...." We agree, and we anticipate that the pleading defect will be cured by amendment following the remand
 
 
 [9]
 The court also expressed disagreement with the suggestion in United States v. Jennings, 842 F.2d 159, 163 (6th Cir.1988), that a pattern is established merely by proving two predicate acts. 109 S.Ct. at 2899
 
 
 [10]
 18 U.S.C. Sec. 1962(b) reads as follows:
 "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."
 18 U.S.C. Sec. 1962(d) reads as follows:
 "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."
 
 
 [11]
 Stewart, "Scoping Out Statutes," ABA Journal, Sept. 1989, at 54