**Edward D. ARIOLI, individually, as custodian for IRA accounts, and as Trustee of the Edward Arioli Revocable Trust Agreement (as amended), the Edward Arioli Revocable Trust, as amended, Sandra L. Arioli, individually, as custod.an for IRA accounts, and as Trustee of the Sandra L. Arioli Revocable Trust Agreement (as amended), the Sandra L. Arioli Revocable Trust, as amended, Lawrence A. Brainard and Rebecca S. Brainard, Plaintiffs,**

v.

**PRUDENTIAL–BACHE SECURITIES, INC., Terrence Sullivan and Ronald Chewning, jointly and severally, Defendants.**

No. 87–70312.

United States District Court,
E.D. Michigan, S.D.

Jan. 20, 1993.

MacDonald & Goren, P.C., Stephen M. Ryan, Birmingham, MI, Lyle D. Russell, Jr., Livonia, MI, for plaintiffs.

Michael G. Vartanian, Richard A. Wilhelm, Dickinson Wright, Detroit, MI, for defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS IV AND XV OF PLAINTIFFS' THIRD AMENDED COMPLAINT

GADOLA, District Judge.

On June 10, 1992, plaintiffs filed a third amended complaint. Defendants filed an answer August 18, 1992. On September 22, 1992, defendants filed a motion for summary judgment on counts IV and XV of plaintiffs' third amended complaint. Plaintiffs responded November 6, 1992. Defendants filed a reply November 9, 1992.

## I. FACTS

Between April and December 1985 plaintiffs Lawrence and Rebecca Brainard were clients of defendant Terrence Sullivan, a stockbroker employed by the Birmingham, Michigan branch office of Prudential–Bache Securities, Inc. ("PBS"). Defendant Ronald Chewning was the vice president and branch manager of PBS's Birmingham branch office and as such was defendant Sullivan's supervisor.

Plaintiffs allege that defendant Sullivan "falsely represented and agreed to manage the Brainards' funds" in accordance with the Brainards' "conservative investment goals—income, liquidity, and security." Third Amn'd Complaint at 8. Plaintiff also claims that "defendant Sullivan falsely represented himself to [Lawrence] Brainard as an experienced financial advisor and planner, with vast experience in accounting and tax planning, and as a certified tax specialist and as an investment specialist." *Id.* Defendants claim that these statements of defendant Sullivan are true.

Plaintiffs allege that Lawrence "Brainard never authorized any level of options trading risk" and that defendant Sullivan "falsely represented and agreed that no transactions were to take place in the Brainards' account without [Lawrence] Brainard's specific knowledge and permission." *Id.* at 9. Plaintiffs claim that between June and December 1985, defendant Sullivan repeatedly conducted unauthorized options trading on the Brainards' account in spite of the repeated requests of Lawrence Brainard that such trading not be made on the account. *Id.* Plaintiffs also allege that defendant Sullivan stated that options trading was "low risk," "a safe method," and "not to worry about it." Plaintiffs claim that as a result of such trading, the Brainards suffered a loss on their account of approximately $19,694.00 in early December 1985, which loss resulted in a margin call against their account of $24,000.00, and a loss $78,917.00 in mid to late December.[1]

Plaintiffs further allege that Lawrence Brainard informed defendant Sullivan when Brainard first contacted Sullivan in April 1985 that Brainard was not interested in oil stocks or bonds. Nevertheless, in June or July of 1985, "defendant Sullivan made misstatements and omissions of material facts [which] fraudulently induc[ed] [Lawrence] Brainard to purchase 3,000 equity shares of May Energy and $100,000 in Damon Oil bonds, both wholly unsuited to the plaintiff Brainards' investment objectives." Plaintiffs do not state what specifically were the misstatements or omissions.

Defendants deny all of the foregoing allegations of plaintiffs except for the following. Defendants admit that plaintiffs suffered a loss to their account from options trading of $19,694.00 and that, on December 11, 1992, there was a margin call on plaintiffs' account for $24,000.00. Defendants also admit that in December 1985, plaintiffs suffered both losses and gains to their account as a result of options trading.

Finally, plaintiffs Brainards allege that in June 1985, defendant Sullivan began purchasing shares in Equitec Venture Leasing and Polaris Aircraft limited partnerships in an amount which eventually totalled in excess of $200,000.00. Plaintiffs allege that "[d]efendant Sullivan falsely and fraudulently represented to [Lawrence] Brainard that [the] limited partnerships were sound investments, that they would retain their value and yield significant tax benefits, and that they were tailored to meet the Brainards' needs." *Id.* at 13. Plaintiffs allege that in purchasing said limited partnership equity interests, Lawrence Brainard "relied on defendant Sullivan's ongoing representations that he had considerable tax and accounting expertise and would only make investments consistent with [Lawrence] Brainard's stated desire to minimize risk and preserve capital, and on further fraudulent misstatements, improper information and omissions of material facts...." Defendants admit only that plaintiffs purchased limited partnership interests in Equitec Venture Leasing

---

**1.** The court cannot discern from the pleadings whether the stated loss of $78,917.00 includes the previous losses or is in addition to them.

B for $50,000.00, in Polaris Income Fund I for $50,000.00, and for Polaris XII A and B for $120,000.00; defendants deny the remaining allegations.

Plaintiff Sandra Arioli also was a client of defendant Sullivan, a stockbroker in PBS's Birmingham, Michigan branch office. As to plaintiff Sandra Arioli, plaintiffs claim that despite an alleged agreement by defendant Sullivan that no transaction would take place in Sandra Arioli's account without her specific knowledge and prior permission, "on or about February, 1985, or before [sic] defendant Sullivan began options trading in [Sandra] Arioli's accounts without authorization or any type of explanation; such options trading was further begun prior to the dates of an "Option Client Information Form and Agreement" purportedly bearing Mrs. Arioli's name." *Id.* at 14. Plaintiff alleges that such option trading "was fraudulent in that it was based upon misstatements, misrepresentations and omissions of material facts by defendant Sullivan, and such options trading was further unsuited to her needs and investment objectives which were known to defendant Sullivan." *Id.* at 14–15. Defendants deny all the foregoing allegations except that defendants admit that defendant Sullivan agreed that no transaction would take place in Sandra Arioli's account without her specific knowledge and prior permission.

Beginning in 1984 and up until early 1986, plaintiff Edward Arioli also was a client of defendant Sullivan. Plaintiff claims and defendant admits that defendant Sullivan agreed that no transaction would take place in Edward Arioli's accounts without Arioli's specific knowledge and prior permission. Defendants deny plaintiffs allegations that

36. Beginning in 1984, or before, and continuing throughout 1985 and into 1986, defendant Sullivan, with neither explanation to nor authorization from Mr. Arioli, traded options in Mr. Arioli's accounts.

37. That defendant Sullivan's said option trading was fraudulent in that it was based upon misstatements, misrepresentations and upon omissions of material facts by defendant Sullivan, and such options trading was further unsuited to Mr. Arioli's needs and investment objectives. Mr. Arioli incurred net losses in excess of $70,000.00 because of said unauthorized options trading in spite of defendant Sullivan's assurances that the said options trading had "very little risk." [2]

38. On or about October 1985 and again in December of 1985, defendant Sullivan was specifically instructed to cease all options trading in Mr. Arioli's accounts and agreed to do so, but defendant Sullivan failed to do so and refused to cease such options trading.

Defendants admit the allegations in paragraph 39 that defendant Sullivan was specifically instructed to sell all 8,000 of Mr. Arioli's equity shares of May energy; defendants deny, however, that defendant Sullivan failed to do so. Defendants further admit the allegation of paragraph 40 that Mr. Arioli demanded reimbursement for his losses. Defendants deny, however, that plaintiff Edward Arioli has any legal claim to such reimbursement.

Plaintiffs further allege fraud in the sale by defendant Sullivan to plaintiff Edward Arioli of certain limited partnership interests. Plaintiffs and defendants agree that plaintiff Edward Arioli purchased the following limited partnerships:

1. 1984 Polaris VIII for $165,000.00.
2. Equitec Venture Leasing Investors for $500,000.00.
3. Bordeaux Partners for $300,000.00.
4. May Energy for $112,085.85.
5. Polaris Income Fund I for $500,-000.00.

Plaintiffs further allege, and defendants claim to have no knowledge as to the truth or falsity of such allegations, that plaintiff purchased $100,000.00 worth of PS Partners, Ltd; $329,834.00, or more, worth of

---

**2.** The court wonders how plaintiff can argue on the one hand that defendant had no authorization and gave no explanation for the options trading and on the other hand that defendant had given plaintiff assurances that said options trading had "very little risk."

Harbor Vista Associates Limited Partnership; shares of Balcor Investors, Damson Oil, Apache Petroleum; as well as commodity transactions; and "[o]ther equity interests and securities yet to be determined. Plaintiff alleges that defendant Sullivan

fraudulently represented to Mr. Arioli, *inter alia,* that said limited partnerships were sound investments that would retain their value and yield substantial tax benefits and that they were all suited to Mr. Arioli's individual needs and objectives, and that Mr. Arioli could readily sell all of these investments at any time if he so desires, and that each investment would have a stated rate of return—all of which statements were untrue and known as such to defendant Sullivan. Sullivan further fraudulently tricked Mr. Arioli in to [sic] purchasing limited partnership interests by telling Mr. Arioli that he had sent Mr. Arioli certain subscription documents in error and that he (Sullivan) would destroy these documents and submit the proper ones when, in fact, Sullivan did submit them....; and that Mr. Arioli also relied upon further fraudulent misrepresentations and improper information given by defendant Sullivan and defendant Sullivan further omitted several material facts relating to the purchase of said equity interests.[3]

*Id.* at 19.

Finally plaintiff Edward Arioli alleges that defendants Sullivan, Chewning, and PBS "participated directly or indirectly in the preparation of documentation which contains inaccurate or improper information and may contain forged signatures, all as part of a broader scheme to defraud ... Mr. Arioli was fraudulently induced and/or his signature was forged on certain documents." *Id.* at 20.

Plaintiffs set forth twenty-two counts in their third amended complaint. Defendants are moving for summary judgment only on those counts implicating 18 U.S.C. §§ 1962(a) and 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which are counts IV and XV.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citation omitted). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir. 1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

---

**3.** All plaintiffs make the claim which defendant denies, that the partnership interests purchased by plaintiffs are unmarketable at the present time.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. ANALYSIS

#### A. PLAINTIFF'S SECTION 1962(a) CLAIM

■ Both of counts IV and XV include a claim under section 1962(a) of the RICO statute. Section 1962(a) proscribes "the use or investment" of any income derived from a pattern of racketeering activity "in the establishment or operation of, any enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a). The gravamen of a section 1962(a) claim is an injury directly related to the investment or use of tainted money in the enterprise; section 1962(a) is not applicable to injury from the racketeering activity itself. *Berent v. Kemper Corp.*, 780 F.Supp. 431, 446 (E.D.Mich.1991).

■ In order to state a viable section 1962(a) claim, plaintiffs must allege a separate and traceable injury "stemming directly from the defendants' alleged use or investment of their [allegedly] illegally obtained income in the [RICO] enterprise." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 494 (6th Cir.1990).[4] Plaintiffs argue, however, that *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 396 (6th Cir.1989), is apposite in this case. In *Newmyer*, the Sixth Circuit held that if a plaintiff could plead and prove that the defendant had used money from previous racketeering activities to establish and operate the alleged scam in which plaintiffs put their money, then plaintiffs would be able to show that they had been injured by a violation of section 1962(a).

■ The *Newmyer* case involved a motion for failure to state a claim upon which relief could be granted. Plaintiff in that case had alleged in their complaints that the defendants had been acting in concert over a period of five years, defrauding hundreds of taxpayers in addition to plaintiffs. The court there held that "[i]f these allegations are true, and if defendants used income derived from racketeering activity in 1980 and 1981 to establish and operate the alleged scam in which the plaintiffs put their money in 1982 and 1983, we do not see why it would be impossible for the plaintiffs to show that they had been injured by a violation of section 1962(a)." *Newmyer*, 888 F.2d at 396. Because the *Newmyer* case was dealing only with a motion for failure to state a claim upon which relief could be granted, the holding effectively did no more than state that plaintiffs must be given the opportunity to

---

**4.** Plaintiffs argument that the United States Court of Appeals for "the Sixth Circuit has neither adopted the 'investment or use' rule, nor rejected it" is erroneous. The *Craighead* case clearly stands for the proposition that a plaintiff suing for damages under section 1962(a) must prove that injury resulted from the use or investment of the racketeering income.

prove that they were in fact caused injury by the investment or use of racketeering proceeds.

Furthermore, the *Newmyer* case involved a wholly illegal enterprise whereas the case at bar involves an otherwise legally organized securities firm that is accused by plaintiff of engaging in fraudulent activities. Where it is alleged that there was an investment of illegally derived income into an otherwise legitimate enterprise, such as an investment brokerage firm, injury is difficult to prove because the investment could have been an investment in the legitimate activities of the enterprise. *Snider v. Lone Star Art Trading Co., Inc.,* 659 F.Supp. 1249, 1256 (E.D.Mich.1987).

In the case at hand, plaintiffs argue in their response to defendants' motion for summary judgment that they were injured by the use or investment by defendants of funds that were gained by previous fraudulent activity. However, plaintiffs offer no proof whatsoever to support these claims. Because plaintiffs are responding to a motion for summary judgment, they have the burden of presenting to the court more than mere allegations. As stated *supra,* the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas,* 738 F.Supp. at 217.

Thus, because plaintiffs fail to produce any evidence that they were injured by the use or investment of funds allegedly derived from racketeering activities, the court finds that there can be no genuine issue of material fact as to plaintiffs' claim under section 1962(a). Accordingly, plaintiffs claim under this section will be dismissed as to all defendants.

**B. PLAINTIFF'S SECTION 1962(c) CLAIM**

■ To establish a civil RICO claim under section 1964(c) arising out of a violation of section 1962(c), plaintiff must show

(1) the defendants are "persons," as defined in 18 U.S.C. § 1961(3);

(2) the existence of an "enterprise," as defined in 18 U.S.C. § 1961(4);

(3) employment or association of the defendant persons with the named enterprise;

(4) conduct by the enterprise affecting interstate or foreign commerce;

(5) direct or indirect actions of the defendant persons which constitute "conducting or participating in the conduct of the enterprise's affairs through a pattern of racketeering activity," as defined in 18 U.S.C. § 1961(1) and (5);

(6) an injury to the plaintiff's business or property; and

(7) a causal link between plaintiff's injury and the section 1962(c) violation.

The structure of the RICO statute requires that a civil RICO claim under 1962(c) must identify as the "enterprise" an entity that is separate from the defendant "person." *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1489 (6th Cir.1989); *Haroco, Inc. v. Amer. Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Bennett v. U.S. Trust Co. of N.Y.,* 770 F.2d 308 (2d cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

**1. Plaintiffs Claims Against Defendants PBS and Chewning**

In their third amended complaint, plaintiffs allege that defendants Sullivan, Chewning and PBS "conducted and participated, directly or indirectly, in the conduct of the affairs of the enterprise PBS or alternatively an association-in-fact enterprise consisting of Sullivan, Chewning and PBS or PBS's Birmingham office, each of which has been in engaged in or the activities of which have affected interstate commerce, through an extensive pattern of racketeering activity ..." Plaintiffs base their cause of action against PBS and Chewning on a theory of *respondeat superior,* arguing that Chewning failed "to effectively supervise and exercise control over defendant Sullivan," and that PBS "knew of or recklessly disregarded the wrongful activities of Sullivan and Chewn-

ing...."[5]

■ *Respondeat superior* is a common law doctrine evolving out of the state courts. In litigation under federal statutes, common law doctrines are appropriately applied only where the principles underlying those doctrines are consistent with the congressional intent underlying the statutes. *American Soc. of M.E.'s v. Hydrolevel Corp.*, 456 U.S. 556, 570, 102 S.Ct. 1935, 1944, 72 L.Ed.2d 330 (1982). Because holding an enterprise vicariously liable for a section 1962(c) violation by an employee would effectively circumvent the statute's requirement that the person be separate and distinct from the enterprise, the doctrine of respondeat superior is inconsistent with the congressional intent underlying section 1962(c). *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987). Therefore, an enterprise cannot be held vicariously liable for violations of section 1962(c) committed by its employee where the employee is named in the complaint as having conducted the affairs of the enterprise through a pattern of racketeering activity. *Id.* Thus, PBS cannot be held liable under the doctrine of *respondeat superior* for the acts of defendant Sullivan, its employee.

■ The legal concept of a corporation includes its employees and officers. *Radionic Industries, Inc. v. GTE Products Corp.*, 665 F.Supp. 622 (N.D.Ill.1987). Since Chewning is merely an officer of the corporation-enterprise, the rationale of *Petro–Tech* also extends to prevent holding defendant Chewning liable under a theory of respondeat superior. Thus, regardless of the enterprise alleged by plaintiffs, there is no factual or legal basis for holding either defendants PBS or Chewning liable for violating the provisions of RICO. Thus, the court finds that as to these two defendants, plaintiffs have failed to allege facts that would create a genuine issue of material fact sufficient to go to trial.

## 2. Plaintiffs Claims Against Defendant Sullivan

■ Plaintiffs section § 1962(c) claims against defendant Sullivan also must fail. Plaintiff alleges that defendant Sullivan has engaged in a pattern of racketeering activity by engaging in acts indictable under 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), and in offenses involving fraud in the sale of securities. Defendants deny any wrongdoing on the part of defendants, including defendant Sullivan, and point to the lack of evidence in the record to support such a finding. Defendant's brief at 2.

In their response to defendants' motion for summary judgment, plaintiffs have failed to provide any evidentiary support whatsoever which could lead to a finding that there are genuine issues of material fact as to the existence of such predicate acts. Plaintiffs do not even attach affidavits of the parties that might support a factual finding that defendant Sullivan made misrepresentations amounting to securities fraud, mail fraud or wire fraud. Where investors fail to plead the predicate acts of fraud with any specificity, the court may use its discretion to dismiss the claims. *Craighead*, 899 F.2d at 495. The court finds that plaintiffs' failure to come forward with even a scintilla of evidence to support their predicate act claims must necessarily lead to a finding that there are no genuine issues of material fact with respect to the counts on which defendant has moved for summary judgment.

### ORDER

Therefore, it is hereby ORDERED that defendants motion for summary judgment is GRANTED.

SO ORDERED.

---

**5.** Plaintiffs further claim that PBS "knowingly induced, participated in, approved and/or accepted the benefits of unauthorized, excessive, unsuitable, and deceptive trading practices to plaintiffs [Brainards and Ariolis] damage."

Plaintiffs offer no factual allegations to support such a claim and tender no evidence whatsoever to support such an allegation. Thus, there can be no genuine issue of material fact with respect to such allegations.